```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

_____

TAHARQU DEAN,

              Plaintiff,        Civil No. 13-5197 (NLH/KMW)

v.

                                       **OPINION**

GLOUCESTER COUNTY, et al.,

              Defendants.

_____

**APPEARANCES:**

David Andrew Berlin
Matthew Benjamin Weisberg
Weisberg Law
7 South Morton Avenue
Morton, Pennsylvania 19070

    *Attorneys for Plaintiff*

Patrick J. Madden
Timothy R. Bieg
Madden & Madden, PA
108 Kings Highway East
Suite 200
P.O. Box 210
Haddonfield, New Jersey 08033-0389

    *Attorneys for Defendants Gloucester County, Gloucester County Department of Correctional Services, and Sergeant Jesse Yamada*

**HILLMAN, District Judge:**

    This matter comes before the Court by way of motion [Doc. No. 138] of Defendants Gloucester County, Gloucester County

Department of Correctional Services, and Sergeant Jesse Yamada (collectively, the "Gloucester Defendants") seeking summary judgment. The Court has considered the submissions of the parties and decides this matter pursuant to Fed. R. Civ. P. 78.

For the reasons that follow, the Gloucester Defendants' motion will be granted in part and denied in part.

I. **BACKGROUND**

This case concerns the pretrial detention of Plaintiff Taharqu Dean from December 27, 2011 to December 30, 2011. Plaintiff suffers from a seizure disorder and has undergone multiple brain surgeries. (Defs.' Ex. D, Pl.'s Dep. 141:19-142:21 [Doc. No. 149-5].) Plaintiff alleges that on December 27, 2011 he was walking in a deli parking lot in Deptford, New Jersey when he experienced a severe seizure. (Am. Compl. ¶ 15.) A Gloucester County detective observing Plaintiff believed he was breaking into a car in the parking lot, and after a struggle, Plaintiff was arrested by Deptford Township Police Officers. (Defs.' Statement of Material Facts ¶ 7; Am. Compl. ¶ 8.)[1] The Deptford Township Police report states that during the struggle Plaintiff kicked an officer in the chest. (Defs.' Ex. D, Police Report [Doc. No. 138-2].) Plaintiff testified that he

---

[1] Plaintiff voluntarily dismissed all claims against Deptford Township and the arresting officers on October 1, 2015 [Doc. No. 153].

2

does not remember kicking an officer because he often doesn't remember what occurs during a seizure. (Pl.'s Dep. 55:1-2, 13-24.) After being processed and charged with attempted burglary and resisting arrest,[2] Plaintiff was transported to Kennedy Hospital and thereafter to Gloucester County Correctional Facility. (Id. ¶ 10.)

Plaintiff alleges that because he kicked a Deptford officer in the chest during his arrest, when he arrived at the Gloucester County Correctional Facility, Sergeant Jesse Yamada stated to him, "oh, we've been waiting on you. You like to hit on cops, huh[?]". Plaintiff further alleges Sergeant Yamada took him to the shower room and along with three other corrections officers beat him up. (Pl.'s Dep. 54:14-55:10.) He claims he was assaulted a total of three times while in handcuffs. After the second alleged assault, Plaintiff alleges he was seen by the correctional facility's medical staff. (Id. 111:8-19; Defs.' Ex. G, Intake Receiving and Screening Form [Doc. No. 138-2].) It is noted on Plaintiff's medical form that he claimed "altercation on admission" to the medical staff. (Id.)

Nurse Judy Muhlbaier, who performed Plaintiff's medical examination, noted on Plaintiff's progress notes that when she

---

[2] All of Plaintiff's charges were dismissed. (Pl.'s Ex. C, Court Record [Doc. No. 149-4].)

asked Plaintiff if he was suicidal he tried to conceal a history of suicidal attempts or thoughts. Additionally, Nurse Muhlbaier noted that Plaintiff first told her he was feeling suicidal and then changed his answer. (Defs.' Ex. H, Medical Progress Notes [Doc. No. 138-2].) Based on this information, Nurse Muhlbaier recommended that Plaintiff be placed in a suicide prevention suit, also known as a "turtle suit". (Defs.' Ex. I, Muhlbaier Dep. 42:21-43:8 [Doc. No. 138-2].) Plaintiff disputes that he was suicidal or that he articulated he was suicidal to the medical staff. (Pl.'s Statement of Material Facts ¶ 26.) Plaintiff argues that the medical staff failed to give him two out of three of his seizure medications which caused him to suffer more seizures while detained. (Am. Compl. ¶¶ 30-32.)

Plaintiff testified that during the third assault corrections officers took Plaintiff to the shower room and forced him into the suicide prevention suit. (Pl.'s Dep. 114:14-115:8.) Sergeant Yamada stated in his December 27, 2011 incident report that Corrections Officers C. Finnegan and S. Borden reported to him that when they tried to place Plaintiff in the suicide prevention suit Plaintiff assaulted them and they were forced to spray Plaintiff with pepper spray. (Defs.' Ex. J, Sgt. Yamada's Report [Doc. No. 138-2].) Sergeant Yamada further stated in his report that Plaintiff was also placed in a restraint chair due his aggressive behavior and because

4

Plaintiff made threats to the corrections officers that he had friends in the military and would come back with explosives to blow them up. (Id.) Corrections Officers Finnegan and Borton's December 27, 2011 supplemental reports are consistent with Sergeant Yamada's version of events. (Defs.' Exs. J, L.)

Plaintiff alleges that as a result of being assaulted three times by corrections officers he suffered injuries to his shoulder, face, neck, and back, and received two black eyes. (Pl.'s Dep. 141:9-142:4.) Plaintiff alleges he sought rehabilitative care and psychological treatment for his injuries. (Pl.'s Dep. 166:17-21, 176:11-22.) Plaintiff further alleges one doctor recommended shoulder surgery. (Pl.'s Dep. 174:1-11.)

Plaintiff filed his original complaint on August 29, 2013. Pursuant to an Order dated April 29, 2014, Plaintiff was granted leave to file an amended complaint, which was filed on May 8, 2014. In the amended complaint, Plaintiff added Corrections Officers Borton and Finnegan as parties and asserted four causes of action against the corrections officers. (Am. Compl. ¶¶ 12, 13.) In a Memorandum Opinion and Order dated June 16, 2015, the Court found that the claims against these new corrections officers were barred by the statute of limitations and did not relate back to the filing of the original complaint pursuant to Fed. R. Civ. 15(c). The Court therefore dismissed all claims

5

against Corrections Officers Borton and Finnegan.  (June 16, 2015 Op. and Order [Doc. Nos. 134, 135].)

The instant motion for summary judgment was filed by the remaining Defendants, Gloucester County, Gloucester County Department of Corrections, and Sergeant Yamada.  Counts I is an excessive force claim brought pursuant to 42 U.S.C. § 1983 and Count II is a Monell claim.  (Am. Compl. ¶¶ 39-48.)  Count III alleges a violation of the New Jersey Civil Rights Act under N.J. Stat. Ann. § 10:6-2.  (Id. ¶¶ 49-51.)  Count VII contains common law tort claims for assault and battery.  (Id. ¶¶ 69-70.)

**II.   JURISDICTION**

This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a), which provides in relevant part, "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

**III. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255). Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by

7

the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**IV.   DISCUSSION**

    **A. Count II: Monell Claims Against Gloucester County, Gloucester County Department of Corrections and Sergeant Yamada in his Official Capacity**

Generally, "a municipality cannot be held liable under § 1983 on a respondeat superior theory."  Marvel v. Cnty. of Del., 397 F. App'x 785, 790 (3d Cir. 2010) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)).  A municipality may be held liable under 42 U.S.C. § 1983 "'only ... when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom.'"  Mulholland v. Gov't of the Cnty. of Berks, Pa., 706 F.3d 227, 237 (3d Cir. 2013) (citing Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996)).  Accordingly, "there are two ways that a plaintiff can establish municipal liability under § 1983: [either] policy or custom."  Watson v. Abington Twp., 478 F.3d 144, 155 (3d Cir. 2007).

"Under Monell, a plaintiff shows that a policy existed when a decision maker possess[ing] final authority to establish

municipal policy with respect to the action issues an official proclamation, policy, or edict." Watson, 478 F.3d at 155 (citation and internal quotations omitted). Alternatively, "[a] plaintiff may establish a custom ... by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.  In other words, custom may be established by proving knowledge of, and acquiescence to, a practice." Id. at 155-56 (citation and internal quotations omitted). Where municipal liability is premised on an unofficial custom, the plaintiff must "produce facts tending to show the [municipality] knew of a pattern of constitutional violations or that such consequences were so obvious the [municipality's] conduct can only be characterized as deliberate indifference." Pelzer v. City of Phila., 656 F. Supp. 2d 517, 533 (E.D. Pa. 2009).  "In addition to proving that an unlawful policy or custom existed, a plaintiff also bears the burden of proving that such a policy or custom was the proximate cause of the injuries suffered." Watson, 478 F.3d at 156.

Here, Plaintiff's two Monell theories are that: (1) Defendants fail to recognize the medical needs of pretrial detainees, and (2) Defendants place inmates in suicide prevention suits, also known as "turtle suits", for punishment. Plaintiff appears to premise these theories on an unofficial

9

custom.  The Court finds, however, that Plaintiff has not produced facts tending to show that there was a pattern of constitutional violations or that the custom was the proximate cause of the injuries suffered.

As to Plaintiff's claim that he did not receive two out of his three seizure medications, he has not submitted evidence of a custom of depriving detainees of medication.  In support of his argument, Plaintiff cites to Nurse Muhlbaier's deposition testimony where she stated she was conscious of cost-cutting and was often pressed for time.  (Pl.'s Statement of Material Facts ¶¶ 15-16.)  However, Nurse Muhlbaier's testimony was not in the context of being able to provide detainees and inmates with needed medication.  Further, Nurse Mulbaier could only recall one time when she believed an inmate should have been sent to the hospital for treatment related to his diabetes and was not. (Muhlbaier Dep. 22:3-6 ("Q: Do you recall other times when there was a failure to provide needed medical care at the prison? A: No.")  The treatment of one other detainee is not sufficient to infer a custom of failing to provide detainees and inmates with needed medication.

Nurse Muhlbaier testified that the reason Plaintiff only received one of his three medications is because the facility's doctor, Dr. Ash, who is not a county employee, only ordered that medication to control Plaintiff's seizures.  (Muhlbaier Dep.

10

34:6-10; Cert. of Lynn Heiss, R.N. ¶¶ 2, 3, 10, 22, 26 [Doc. No. 157-1].) Moreover, Plaintiff has submitted no evidence that the fact that he did not receive two of his three medications caused his behavior or his seizures. Watson v. Abington Twp., 478 F.3d 144, 156 (3d Cir. 2007) (citation omitted) (a plaintiff must show that the unofficial custom was the proximate cause of the injuries suffered).

Accordingly, there is nothing to suggest that there was a custom of depriving detainees and inmates with medication or that the absence of a particular medication "created" Plaintiff's aggressive condition or his seizures. As such, Plaintiff's first theory of Monell liability fails.

Plaintiff's second theory of Monell liability is that Defendants used the suicide prevention suits for purposes of punishment. Defendants, in turn, assert that Plaintiff was placed in a suicide prevention suit because Nurse Muhlbaier believed he was suicidal. Nurse Muhlbaier testified that she evaluated Plaintiff and noted that when she asked if he was suicidal he said yes, then changed his answer to no. (Muhlbaier Dep. 43:5-8). Based on her evaluation of Plaintiff she recommended that he be placed in the suicide prevention suit until he could be seen by the psychiatrist because she felt "dual answers are a red flag[.]" (Muhlbaier Dep. 43:13-44-6.) Plaintiff's intake form also noted that Plaintiff felt "hopeless

11

and helpless and that he concealed a suicidal history." (Defs.' Ex. G, Intake Form [Doc. No. 138-2].)[3]

While Plaintiff alleges he did not give Nurse Muhlbaier a reason to believe he was suicidal on December 27, 2011, that is not a disputed issue of material fact. Rather, Plaintiff must show that Defendants used the suicide prevention suit as a means of punishment as Plaintiff alleges in his amended complaint. (Am. Compl. ¶¶ 35, 42.) Plaintiff's only evidence that Defendants used the suicide prevention suit as punishment is Corrections Officer Finnegan's deposition testimony that Defendants used the suicide prevention suits "all the time." (Pl.'s Opp. Br. at 14.) However, Officer Finnegan's full testimony states that the suit was utilized often because inmates often present as suicidal:

> Q. One second. How many times have you ever put somebody in a turtle suit?
> A. Many.
> Q. Many. It's pretty common?
> A. Yes.
> Q. Did you do it weekly, monthly, can you give me --
> A. Daily.
> Q. Daily. So on a daily basis people threaten to commit suicide?

---

[3] Plaintiff cites to a Mental Health Progress Note from December 30, 2011, which states that Plaintiff was not suicidal, however this note was made three days after his initial intake. (Pl.'s Ex. E, Dec. 30, 2011 Progress Note at 6 of 6 [Doc. No. 149-6].) Further, Plaintiff does not allege he was placed in the protective suit after the first night of his detention.

    A. Yes.

(Finnegan Dep. 16:4-14 [Doc. No. 149-10].)  Without any evidence suggesting that Defendants used suicide prevention suits as punishment, Plaintiff's second theory of Monell liability also fails as a matter of law.  Summary judgment will be granted to the Gloucester Defendants on Count II.

    **B. Count I: Excessive Force Against Sergeant Yamada and the Defense of Qualified Immunity**

    For Plaintiff's claims against Sergeant Yamada in his individual capacity, the qualified immunity doctrine governs the analysis. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012).  In order to determine whether a government official is entitled to qualified immunity, two questions are to be asked: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) is the right at issue "clearly established" at the time of the defendant's alleged misconduct? Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." Id.  It is the

13

defendant's burden to establish entitlement to qualified immunity.  Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004).

Plaintiff's excessive force claim is analyzed under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment because Plaintiff was a pretrial detainee during the relevant time period.[4]  Tapp v. Proto, 404 F. App'x 563, 566 (3d Cir. 2010) (per curiam) (noting that plaintiff's claims that arise when he was a pretrial detainee are prosecuted under the Due Process Clause); Ewing v. Cumberland Cty., No. 09-5432, -- F. Supp. 3d --, 2015 WL 1384374, at *14 (D.N.J. Mar. 25, 2015) ("Plaintiff, who had just been arrested that day, should be afforded the greater constitutional prevention that is offered by the Due Process Clause").[5]

---

[4] The Third Circuit has recognized an exception to this general rule where the excessive force claim arises from a riot or prison disturbance.  Fuentes v. Wagner, 206 F.3d 335 (3d Cir. 2000).  The Court finds the Fuentes exception inapplicable here because Plaintiff alleges he was handcuffed every time he was assaulted and did not pose a genuine safety threat to the four corrections officers handling him.  See Jackson v. Phelps, 575 Fed. Appx. 79 (3d Cir. 2014) ("[T]he purportedly unlawful actions in this case occurred when Jackson was isolated in an observation room . . . [while] Jackson was effectively immobilized in full restraints.  There is no evidence that Jackson could have incited a prison riot or other widespread disruption under these circumstances, let alone that he did. We therefore agree with the District Court that Jackson's claim is most properly characterized as one invoking the protections of the Fourteenth Amendment's Due Process Clause [and not the Eighth Amendment].") (internal citation omitted).

[5] Even if the Court were to apply the Eighth Amendment standard, the result would be the same here and summary judgment would be

As the Supreme Court held in Bell v. Wolfish, 441 U.S. 520, 520-21, 99 S. Ct. 1861, 1864, 60 L. Ed. 2d 447 (1979), absent a showing of an expressed intent to punish, the inquiry under the Due Process Clause is whether "a particular condition or restriction is reasonably related to a legitimate nonpunitive governmental objective[.]"  Here, Plaintiff alleges Sergeant Yamada intended to punish him.  Plaintiff testified that because he unknowingly kicked a police officer in the chest during his arrest[6] when he arrived at the Gloucester County jail Sergeant Yamada stated to him, "oh, we've been waiting on you. You like to hit on cops, huh" and then immediately took him to the shower room and with the help of three other corrections officers beat him up.  (Pl.'s Dep. 54:14-55:10.)  Plaintiff further testified he was assaulted two other times while he was handcuffed.  (Pl.'s Dep. 106:16-18.)  Plaintiff additionally argues that

---

denied.  The less stringent Eighth Amendment standard "only prohibits punishment that is cruel and unusual, or force that is imposed 'maliciously and sadistically to cause harm.'" Ewing v. Cumberland Cty., 2015 WL 1384374, at *13 (citing Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992); Whitley v. Albers, 475 U.S. 312, 321, 106 S.Ct. 1078, 89 L. Ed. 2d 251 (1986)).  Here, there is also a material question of fact as to whether Sergeant Yamada used force maliciously and sadistically to cause harm.

[6] To be clear, Plaintiff testified that he does not remember kicking an officer during the arrest because he often can't remember what occurs during a seizure.  However, Plaintiff acknowledges the police report reflects that he kicked a Deptford officer.  (Pl.'s Dep. 55:1-2, 13-24.)

15

Sergeant Yamada had a duty to treat him differently due to his seizure disorder.[7]

Plaintiff testified that the total injuries he suffered from the three assaults include a bruised back, neck and face, a partial tear in his rotator cuff, and black eyes. (Pl.'s Dep. 166:10-13.) His medical intake form reflects that he reported to Nurse Muhlbaier that he was assaulted. (Defs.' Ex. G, Intake Receiving and Screening Form.) Additionally, the pictures taken of Plaintiff after his release on or around January 6, 2012 show injuries to his face. (Pl.'s Ex. K-1 [Doc. No. 149-12].) As a result of his injuries, Plaintiff alleges he sought rehabilitative care and psychological treatment. (Pl.'s Dep. 166:17-21, 176:11-22.) Plaintiff testified that one doctor recommended shoulder surgery. (Pl.'s Dep. 174:1-11.)[8]

Sergeant Yamada disputes that he made a statement that he was waiting for Plaintiff or that he knew Plaintiff kicked a

---

[7] Plaintiff has cited no case law to support his proposition that Sergeant Yamada had what is essentially a heightened duty with respect to Plaintiff because he suffered from a seizure disorder. Further, under Sergeant Yamada's version of events, he applied only what force was necessary to restrain Plaintiff in order to prevent him from assaulting corrections officers.

[8] Additionally, the Court rejects Defendants' argument that Plaintiff's injuries are *de minimis*. As held in Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002), even if Plaintiff's injuries were *de minimis*, "*de minimis* injuries do not necessarily establish *de minimis* force."

16

police officer and argues that any force used on Plaintiff was in response to Plaintiff's assault on corrections officers. (Pl.'s Ex. Yamada Dep. 14:6-12, 23:12-22 [Doc. No. 149-8].) Sergeant Yamada's incident report states, in relevant part,

> While he was in the holding cell, inmate Dean yelled obscenities towards me and stated, "I'll fuck you up when I get out." I removed inmate Dean from the holding cell at 1940 hours and as I proceeded to remove the handcuffs, he was arguing and not being compliant. I assisted escorting him to the shower room to strip and search him. As I started to remove his handcuffs, he grabbed my arm and attempted to turn towards me, stating that he was going to kill as many officers as he could. I grabbed his left arm and placed a compliance hold on him to gain better control of him. A brief struggle ensued and I was forced to take him to the ground to gain control and re-apply his handcuffs. . . . Inmate Dean was escorted from cell 309 by C/O Finnegan and C/O Borton to the lower level, shower room one, to be placed in a suicide gown to go in holding four. I heard a commotion in the shower room and as I opened the door, Officer[s] Finnegan and Borton stated that inmate Dean assaulted them and they were forced to spray him with [pepper] spray. Inmate Dean was allowed to decontaminate himself, then he was placed in the Emergency Restraint Chair due to his aggressive behavior. While in the chair, he continued with threats, stating that he had friends in the military and would come back with explosives to blow us all up.

(Sgt. Yamada's Report, Defs.' Ex. J.) Sergeant Yamada's Report further describes the injuries he suffered as a result of the altercation with Plaintiff. The incident reports of Corrections Officers Borton and Finnegan corroborate Sergeant Yamada's version of events. (Defs.' Exs. J, L.) Plaintiff disputes that he ever assaulted a corrections officer. (Pl.'s Dep. 207:5-12.)

17

As Plaintiff and Sergeant Yamada present conflicting evidence regarding the use of force, the Court finds there is a genuine issue of material fact which cannot be resolved on summary judgment. The Court cannot make credibility determinations at the summary judgment stage, and the facts here are disputed in significant and material ways that prevent the Court from accurately assessing Sergeant Yamada's entitlement to qualified immunity. Accordingly, Sergeant Yamada's motion for summary judgment on the basis of qualified immunity must be denied without prejudice at this time.

In this case, the Court must employ the special interrogatory procedure for the jury to resolve the disputed facts regarding Plaintiff's excessive force claims. Whether the force used against Plaintiff was excessive in light of the circumstances involving his pretrial detention and medical issues must be resolved by a jury. For the same reasons, Defendants' motions with regard to Plaintiff's New Jersey Civil Rights Act claims contained in Count III of Plaintiff's amended complaint and assault and battery claim contained in Count VII must also be denied. Martin v. Unknown U.S. Marshals, 965 F. Supp. 2d 502, 548 (D.N.J. 2013) ("[T]he New Jersey Civil Rights Act is interpreted analogously to 42 U.S.C. § 1983.").

18

**V.     CONCLUSION**

Summary judgment will be granted to the Gloucester Defendants as to the Monell claims in Count II of Plaintiff's amended complaint.  Plaintiff's excessive force claim against Sergeant Yamada contained in Count I of Plaintiff's amended complaint raises genuine disputes of material fact, and as such, summary judgment will be denied.  For the same reasons, summary judgment on Plaintiff's New Jersey Civil Rights Act claims contained in Count III and assault and battery claims contained in Count VII will also be denied.

An Order accompanying this Opinion will be entered.

                                                  s/ Noel L. Hillman
                                                  NOEL L. HILLMAN, U.S.D.J.

Dated: March 2, 2016

At Camden, New Jersey